**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

DALE BRYANT,
ADC #99472                                                        PLAINTIFF

5:12CV00226-SWW-JTK

RAY HOBBS, et al.                                                DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDATIONS

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge Susan Webber Wright.   Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection.  If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection.  An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations.   The copy will be furnished to the opposing party.   Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.      The detail of any testimony desired to be introduced at the hearing before the

1

District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## DISPOSITION

## I.     Introduction

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. No. 126), and Defendants' Motion for Summary Judgment (Doc. No. 129).  Defendants filed a Response to Plaintiff's Motion (Doc. No. 132), and Plaintiff filed a Response to Defendants' Motion (Doc. No. 133).

Plaintiff Dale Bryant is a state inmate incarcerated at the Ouachita River Unit of the Arkansas Department of Correction (ADC).   He filed this action pursuant to 42 U.S.C. § 1983, alleging violations of his First and Eighth Amendment rights.[1]  Defendants Hobbs, Kelley, and Person were dismissed for failure to state a claim upon which relief may be granted, on August 13, 2012 (Doc. No. 11).  Defendant Anderson was dismissed for failure to obtain service, on November 28, 2012 (Doc. No. 69).  Plaintiff's remaining claims are Eighth Amendment deliberate indifference

---

[1]Plaintiff's First Amendment claims were dismissed on November 5, 2012, pursuant to his own Motion (Doc. No. 57).

claims against Dr. Nwannem Obi-Okoye (Dr. Obi), Dr. Debra Clyde, Nurse Aric Simmons, Roslyn Summerville, Wannetta Clowers, Corizon Medical Services, Inc., Nurse Sabainah Awopetu, and Juanita Stell, medical professionals who worked at the Diagnostic or Ouachita River Units.  Plaintiff asks for monetary and injunctive relief.

## II.    Amended Complaint (Doc. No. 5)

The events set forth in Plaintiff's Amended Complaint took place between June, 2011, and February 1, 2012, at the Diagnostic Unit, and beginning on February 1, 2012, at the Ouachita River Unit (Doc. No. 5, p. 3).  Plaintiff claims Defendants failed to adequately treat his serious medical needs of a persistent cough and accompanying pain, and a heart condition.  (Id., pp. 12-21.)  He sets forth the following facts in his Amended Complaint:

- On June 19, 2011, he developed a nagging, non-productive cough, causing pain to his ribs and side. (Id., p. 12.)  He submitted a sick call request on June 26, 2011, and was seen by non-party Nurse Tripp, who provided him medications and instructed him to return if he did not improve. (Id.) He returned to sick call on June 28, 2011, and was seen by Defendant Summerville, a registered nurse practitioner (RNP), who prescribed an antibiotic and Mucinex. (Id., p. 13.)

- Plaintiff spoke to B. Williams, the grievance officer, on July 1, 2011, about not receiving his medications.  A hospital security officer contacted Defendant Clowers, a RNP, who examined Plaintiff and ordered a chest x-ray, blood work, and an inhaler.  (Id.) On July 4, 2011, Plaintiff received his medications and an "Ibuterol"[2] breathing treatment at the Unit hospital. (Id.)

- Plaintiff spoke to Defendant Clowers in the hallway on July 14, 2011, about the lack of

---

[2]The Court assumes Plaintiff means "Albuterol", which is a drug that treats asthma and similar breathing problems.  See http://www.drugs.com/albuterol.html, last visited November 20, 2013.

diagnosis for his continued cough and pain. (Id.)  He was examined by non-party nurse Lewis on

July 19, 2011, during a regular chronic care appointment, and described his cough and pain.  (Id.,

p. 13.)  Later that evening, an officer took him to the hospital because of a persistent cough, where

a nurse examined him, gave him Tylenol, and told him he would see Defendant Dr. Obi the next day.

(Id., p. 14.)

     - The next day, July 20, 2011, Plaintiff experienced pain which affected his ability to walk,

and officer Jenkins took him to the hospital. (Id.) Dr. Obi walked into the hospital, said Plaintiff's

issue was not a hospital issue, and directed him to appear at sick call in the Infirmary. (Id.)

Defendant Clowers gave him a chest wrap and ordered additional x-rays, but would not prescribe

anything for pain. (Id.)

     - On July 22, 2011, Plaintiff vomited from the coughing and went to the Infirmary, where

Defendant Summerville him gave him nausea and pain medication to last for three days, together

with a lay-in from work.  (Id.) She instructed him to return to the Infirmary on July 25, 2011, to see

Defendant Obi.  (Id.)  Although he reported to the Infirmary on July 25, 2011, he did not see Dr.

Obi, and filed a grievance complaining that Obi refused to see him. (Id.) Defendant Summerville

told him he needed to remain still and was causing his condition to worsen. (Id., p. 15.) Plaintiff

became frustrated that Summerville and Clowers were not providing him with pain medication, and

when he complained that he had been asking for help for thirty-eight days, Clowers told him that

she did not care about the "number 38." (Id.) She then gave Plaintiff an additional seven-day lay-in

from work, and told him Dr. Obi would see him the next day.  (Id.)

     - On July 29, 2011, Defendant Obi called Plaintiff to the hospital, informed him the wrong

x-rays were ordered, and ordered new ones.  (Id.) Obi also ordered an ultrasound of Plaintiff's

gallbladder and prescribed him pain medication for three days. (Id.) Plaintiff went to the Unit hospital on August 2, 2011, to have his blood drawn, and when he asked Defendant Summerville about obtaining pain medication, she said she would check with Dr. Obi. (Id.) On August 4, 2011, she told Plaintiff Dr. Obi denied his request for additional pain medication, and all during that night, Plaintiff vomited from the excessive coughing. (Id.)

- An ultrasound test was conducted on Plaintiff's gallbladder on August 8, 2011, and Plaintiff saw Defendant Clowers on August 16, 2011. (Id., p. 16.) She denied his request for pain, and told him she would try and locate his test results. (Id.)  On August 17, 2011, she told Plaintiff the ultrasound results were useless because no one told him in advance that he was going to be tested, and therefore, he failed to fast prior to the test. (Id.) The test was rescheduled for August 22, 2011, and Plaintiff was told not to eat the night before the test. (Id.)

- Defendant Obi called Plaintiff to the hospital on August 31, 2011, and said the test showed that he needed to have his gallbladder removed. (Id.) Dr. Obi prescribed two antibiotics and Mucinex, but refused pain medication. (Id.) She also recommended a ct scan of his right lung and chest. (Id.) On September 13, 2011, Plaintiff underwent the ct scan. (Id.) He became nauseous and vomited, and Clowers gave him Phenergan, but no pain medication. (Id.)

- Plaintiff was treated by an outside surgeon, Dr. Buchman, on September 20, 2011. (Id., p. 16.) Buchman did not have access to Plaintiff's test results, so he ordered another ct scan specific to the gallbladder. (Id., p. 17.) Plaintiff was called to the Unit hospital on October 18, 2011, by Defendant Clyde, who told him that the ct scan indicated he suffered from emphysema, but she did not indicate any treatment. (Id.) On October 19, 2011, Plaintiff went to St. Vincent Hospital for a "heptic bilnary scan" ordered by Dr. Buchman. (Id.)

- Plaintiff's cough continued and he became nauseous on October 21, 2011.  (Id.) He spoke to Ms. Clark in the hallway and she said she would contact Dr. Clyde. (Id.) He then saw Dr. Clyde in the hallway, and although she said she would see him later in the day, he never saw her, and vomited until 2 a.m.  (Id.)

- Plaintiff saw Dr. Buchman on October 25, 2011, who reported that his gallbladder was fine, and that his problems were probably related to an infection which eventually was resolved by the antibiotics Plaintiff was given.  (Id.) He recommended an abdominal scan. (Id.) Plaintiff's cough persisted until mid-January, 2012.  (Id.)

- On November 1, 2011, Plaintiff complained about swelling in his legs, and Defendant Clowers prescribed him Lasix, which did not help. (Id.) Defendant Clyde gave him additional Lasix on November 3, 2011. (Id.) He was taken to see a cardiologist in Pine Bluff, Dr. Dharamsey, on November 4, 2011, who ordered a nuclear stress test. (Id.) Plaintiff told the doctor about his previous heart blockage experience and his concern for immediate medical attention. (Id., p. 18.)  He underwent a ct scan of his abdomen and pelvis as ordered by Dr. Buchman, on November 21, 2011, and filed a grievance about the intentional slow treatment of his heart problems.  (Id.)

- Plaintiff was taken to St. Vincent Hospital on December 16, 2011, for a followup ct scan of his chest, and on December 28, 2011, he went to the cardiologist's office for nuclear stress and leg circulation tests.  (Id.)

- On January 19, 2012, Plaintiff was told that his Tramadol medication expired two days previously and that he should report to the Infirmary for a renewal of the medication.  (Id.) Defendant Simmons told him that Tramadol was labeled as a non-formulary drug and that he was not allowed to prescribe it. (Id.) Instead, he prescribed Nortriptylyne, which was not a proper

medication for a heart patient. (Id.) He also told Plaintiff that several other medications were labeled as non-formulary, and his prescriptions for Prilosec and Baclofen were discontinued. (Id.) Instead, Simmons prescribed Meloxicam for Baclofen. (Id.)  Plaintiff claims these medication decisions evidence deliberate indifference to his serious medical needs and that his former medications could have been prescribed by other means.  (Id., pp. 18-19.)

    - Plaintiff was prescribed an antibiotic on January 11, 2012, for a wound on his right leg, and had a diabetes test on January 12, 2012, about which he never received the results. (Id., p. 19.)  He saw Simmons on January 19, 2012, about his right leg and about the fact that he had not been treated for emphysema. (Id.) He also received an answer to his grievance which indicated he would have a followup appointment with the cardiologist after the test results were received.  (Id.)

    - The Diagnostic Unit closed on February 1, 2012, and Plaintiff was transferred to the Ouachita River Unit. (Id., p. 20.) He saw Dr. Dharamsey on February 17, 2012, to discuss the test results. (Id.) Both legs showed poor circulation and Dharamsey said Plaintiff needed a dye test to determine the necessity of an additional stint placement.  (Id., p. 20.)

    - Plaintiff discussed his health with Defendant Clyde in the hallway on February 24, 2012, and expressed to her his frustration over the lack of progress in diagnosing and treating his heart problems. (Id.)  He had a stint placed in his heart on March 29, 2012, 147 days after he first told Dr. Clyde about his chest pains. (Id., p. 21.) Clyde visited with him on March 31, 2012, and he complained about indigestion and acid reflux.  (Id.) She said the medications he took were not good for his stomach.  (Id.) Plaintiff continued to suffer heart pain and indigestion and sent word to Clyde on April 18, 2012. (Id.) She replied that he should submit a sick call slip.  (Id.)

    - Plaintiff reported severe chest pains to Security on April 30, 2012, and officers escorted

him to the Unit hospital. (Id.) He was transported first to a hospital in Malvern, and then to Pine Bluff, where Dr. Dharamsey conducted a dye test on May 1, 2012, and referred him to another cardiologist, Dr. F. Meaders. (Id.) Plaintiff was transferred to St. Vincent hospital in Little Rock where he underwent quadruple by-pass surgery. (Id.) He continued to experience pain, and on May 30, 2012, had a fifth stint placed in his heart at St. Vincent Hospital. (Id.)

## III.   Summary Judgment Motion

Pursuant to FED.R.CIV.P. 56(a), summary judgment is appropriate if the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir. 1997). "The moving party bears the initial burden of identifying 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Webb v. Lawrence County, 144 F.3d 1131, 1134 (8th Cir. 1998), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (other citations omitted). "Once the moving party has met this burden, the non-moving party cannot simply rest on mere denials or allegations in the pleadings; rather, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. at 1135. Although the facts are viewed in a light most favorable to the non-moving party, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." Id.

### A.   Plaintiff's Motion (Doc. No. 126)

According to Plaintiff, the facts set forth in his Amended Complaint prove he suffered from a serious medical need and that all the Defendants acted with deliberate indifference in treating both

his cough and pain and heart condition. He complains that the delays in treatment and Defendants' refusal to provide him with adequate pain medication are proof of their deliberate indifference. He also complains that the changes in his medications were not medically necessary and that the delays in consultation requests and physician referrals are proof of the lack of training provided by Defendant Corizon.

Defendants oppose Plaintiff's Motion, stating that the evidence shows they provided continuous care to Plaintiff, and his complaints about the type of treatment he received do not support constitutional claims for relief. Defendants do not deny Plaintiff suffered from a cough, but do not admit that it was caused by a serious condition, given the tests, medications, and treatment he received, and the ultimate resolution of the problem on its own. As for Plaintiff's heart condition, Defendants note that once Plaintiff complained about chest pains, Dr. Clyde immediately arranged for an appointment with the cardiologist, who recommended various tests and a return visit the following month. Nothing in the records indicates an urgency for the tests, and the fact that Dr. Clyde did not immediately prepare the consultation requests for the tests is not indicative of deliberate indifference. When Plaintiff did receive the testing, the cardiologist scheduled a followup visit – but not an immediate Cath test – which further evidences the lack of detrimental effect suffered by Plaintiff by the delay in writing the consultation requests. In addition, when Plaintiff asked his cardiologist whether the delay from November 3, 2011, to March 29, 2012, resulted in his numerous heart problems after that time, the cardiologist replied "no, that I – I'm just a plaque-making machine is what he said." (Doc. No. 131-6, p. 15.) Defendants state Plaintiff cannot show that any delay he suffered caused a detrimental effect to his condition or that their actions represented deliberate indifference to his serious medical needs.

In light of the medical records referred to by the Defendants (Doc. No. 131-1, pp. 2-106), the Court finds that a dispute of material fact exists and Plaintiff does not provide proof as a matter of law that Defendants acted with deliberate indifference to his serious medical needs.  Therefore, his Motion should be denied.

**B.    Defendants' Motion**

**1.    Exhaustion**

Defendants first ask the Court to dismiss Plaintiff's Complaint for failure to exhaust his administrative remedies as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e.  Administrative Directive (AD 10-32) was the ADC grievance procedure in effect during this time, and required inmates to specifically name each individual involved in his grievance and fully exhaust the grievance by appealing it through the final level of the process.  (Doc. No. 131-5, p. 1, Declaration of Medical Grievance Coordinator, Shelly Byers.)  According to the ADC grievance records, Plaintiff filed, appealed and exhausted the grievance process for two grievances as of August 27, 2012, OR-11-00150 and OR-11-00228.  (Id., p. 2.)  A third grievance which was appealed, OR-12-00357, was rejected as untimely, and therefore, not exhausted.  (Id., pp. 2-3.)

In grievance OR-11-00150, Plaintiff complained that the doctor (Dr. Obi) refused to see him about his cough and pain, specifically stating:

> The doctor refuses to see me about my cough & severe pain.  Today is 38th day of problem.  I've been to sick call twice, saw the RNP's 3 times, & been escorted to hospital twice.  Was told I'd see Dr. yesterday at 8:30 am.  Was told to come back at 10.  At 10 I was told to come back at 11.  At 11 I was told to lay down, the Dr. would call me.  My lay-in is expired.  The Dr. cannot arbitrarily tell security to send me to my barracks; just like security cannot make the Dr. see me.  I don't need to lay down. I need to see a Dr. to find out what my problem is & why it has persisted 38 days. I have a journal depicting each day's information relative to this problem.

(Doc. No. 131-5, p. 5.)  Defendants state that since Plaintiff did not name any other party in this

grievance, the grievance was exhausted only as to his claim against Dr. Obi, and that the remaining

Defendants should be dismissed.

In the second exhausted grievance, OR-11-00228, filed on December 5, 2011, Plaintiff

stated,

> As a result of chest pain, I was taken to Dr. DeRamsey on 11-4-11.  He ordered a
> stress test & a test for leg circulation.  The tests haven't been done.  I believe the
> process is being intentionally slowed because my last grievance was determined to
> have merit.  They should not wait til I have a heart attack to try & fix the problem.
> It's been a month.  Please help.

(Doc. No. 131-5, p. 5.)  Plaintiff did not specifically identify any of the Defendants in this grievance,

but the doctor who treated him at the Unit, Dr. Clyde, was the only person involved with his heart

treatment. Therefore, this grievance was exhausted only as to Plaintiff's claim against Dr. Clyde.

Finally, Defendants state that a third grievance filed by Plaintiff about his medications, OR-

12-00357, was not exhausted because it was appealed but rejected as untimely.

In Response (Doc. No. 129), Plaintiff states that he adequately provided the sufficient detail

in these grievances needed for an investigation to be conducted about his medical claims.  His

reference in the grievance to the "RNPs" was directed to Defendants Summerville and Clowers, and

he provided as much information as reasonably possible.  In addition, both grievances adequately

cover his allegations against Corizon and Stell, that the lack of training and the inefficient policies

contributed to the constitutional violations.  Finally, with respect to the third grievance, OR-12-

00357, which concerned Defendant Simmons' decision to substitute Plaintiff's medications, Plaintiff

states that Defendants' actions caused his failure to exhaust.  Specifically, he states that it took

officials twenty days to respond to his informal grievance, when he was supposed to receive a

response in three days.  He also did not receive the response until nine days after it was dated, which

11

was beyond the time for appeal. Although he did appeal, it was rejected as untimely. Plaintiff states

that this failure to exhaust should not be held against him and should not prevent him from asserting

his claim against Defendant Simmons.

According to the PLRA,

> No action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner
> confined in any jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a), unconst'l on other grounds, Siggers-El v. Barlow, 433 F.Supp.2d 811, 813

(E.D. Mich. 2006). The courts have interpreted this provision as a mandatory requirement that

administrative remedies be exhausted prior to the filing of a lawsuit. In Booth v. Churner, 532 U.S.

731, 741 (2001), the United States Supreme Court held that in enacting the PLRA, "Congress has

mandated exhaustion clearly enough, regardless of the relief offered through administrative

procedures." In addition, the United States Court of Appeals for the Eighth Circuit held, "[t]he

statute's requirements are clear: If administrative remedies are available, the prisoner must exhaust

them. Chelette failed to do so, and so his complaint must be dismissed, for 'we are not free to

engraft upon the statute an exception that Congress did not place there.'" Chelette v. Harris, 229

F.3d 684, 688 (8th Cir. 2000), quoting Castano v. Nebraska Dep't of Corrections, 201 F.3d 1023,

1025 (8th Cir. 2000). In Johnson v. Jones, 340 F.3d 624, 627 (8th Cir. 2003), the Court held that

"[u]nder the plain language of section 1997e(a), an inmate must exhaust administrative remedies

*before* filing suit in federal court....If exhaustion was not completed at the time of filing, dismissal

is mandatory." (Emphasis in original.) Finally, in Jones v. Bock, 549 U.S. 199, 218 (2007) the

United States Supreme Court held that while the PLRA itself does not require that all defendants be

specifically named in an administrative grievance, "it is the prison's requirements, and not the

PLRA, that define the boundaries of proper exhaustion."

The United States Court of Appeals for the Eighth Circuit recently ruled that prison officials waive the failure to exhaust argument if they decide a procedurally-flawed grievance on the merits. Hammett v. Cofield, 681 F.3d 945 (8th Cir. 2012). In Hammett, an inmate who relied on grievances which were not exhausted or which were filed outside of mandatory time limits was permitted to proceed in his lawsuit, because the "PLRA's exhaustion requirement is satisfied if prison officials decide a procedurally flawed grievance on the merits." 681 F.3d at 947. This line of reasoning was extended to an exhausted grievance filed by an inmate who failed to comply with prison procedures requiring that defendants be specifically named, in Bower v. Kelley, 494 Fed.Appx. 718, 2012 WL 6199266 (8th Cir. 2012). In Bower, an inmate filed a grievance about inadequate dental care and did not specifically name any individuals in his grievance. Despite the ADC grievance process requirement of naming individuals involved, prison officials processed his grievance on the merits through the appeals. The Eighth Circuit rejected the Defendants' arguments on appeal that Plaintiff failed to exhaust his administrative remedies by failing to name them in the grievance, citing Hammett and finding that such argument was waived by deciding the flawed grievance on the merits.     In OR-11-00150, Plaintiff grieved the doctor's "refusal" to see him. Clearly, he exhausted his remedies as to his claim against Dr. Obi in this grievance. However, even though he mentioned or referred to treatment provided to him by "APNs", he did not complain that they were not treating him. He also did not refer to any other Defendants in his grievance. In the Health Services response, Defendant Stell noted that Defendant Clowers arranged for a repeat of his ultrasound test, and in his appeal, Plaintiff referred to the fact that he received the second test requested by Clowers. (Doc. No. 2, p. 23.) He did not, however, complain about any action of

Clowers or about the tests themselves; in fact, his allegations against her in his Amended Complaint relate to her refusal to provide him with requested pain medication, which is never mentioned in this grievance. (Doc. No. 5, pp. 11-12.) The ADC grievance procedure specifically requires an inmate to name all individuals involved in the particular matter at issue. Although the grievance was processed through the final stage, the ADC did not waive the exhaustion requirement because Plaintiff did not name anyone but the doctor, and did not complain about anything other than the doctor's refusal to treat him. Therefore, the Court finds that Plaintiff exhausted his administrative remedies in this grievance only with respect to his claim against Defendant Obi.

In OR-11-00228, Plaintiff did not name any of the Defendants in his grievance. He complained about his cardiac care and the delay in the tests which were ordered by the outside cardiologist. Defendants acknowledge that although he did not name her by name, he referred to the actions of Defendant Clyde in his grievance, because she was the only prison physician treating him for his cardiac care, and because she was responsible for ordering the tests which were allegedly delayed. The Health Service response notes that the consults were completed and Plaintiff attended his next appointment, and Plaintiff's appeal was based on the delay caused by the failure to immediately submit the consult requests. (Doc. No. 2, p. 27.) Furthermore, Plaintiff's Amended Complaint allegations against the remaining Defendants do not relate to his cardiac care, but rather, to the cough issue. Therefore, the Court finds that Plaintiff exhausted his remedies in this grievance only with respect to his cardiac care claim against Defendant Clyde.

The third grievance at issue, OR-12-00357, was filed on February 29, 2012, and concerned the changes Defendant Simmons made to Plaintiff's medications. The initial response was dated March 15, 2012, but Plaintiff did not receive that until March 20, 2012. (Doc. No. 2, p. 35.) (In the

14

meantime, Plaintiff refiled the grievance on March 7, 2012.) (Id., p. 40.) The Health Services response was dated April 4, 2012, and Plaintiff's appeal was dated April 13, 2012. (Id., pp. 36-37.) His appeal (from the first grievance) was received on April 18, 2012, and rejected on May 9, 2012 as untimely. (Id., p. 42.) Plaintiff claims the grievance procedure was flawed and that he should not be penalized for Defendants' failure to adequately process his grievances. Defendants do not address this issue any further; therefore, the Court finds that Plaintiff's claim against Defendant Simmons should not be dismissed for failure to exhaust and that Plaintiff properly exhausted the remedies which were made available to him.

The Court, however, finds that Defendants Corizon, Stell, Summerville, Clowers, and Awopetu, should be dismissed due to Plaintiff's failure to exhaust his administrative remedies with respect to the claims asserted against them.

### 2.     Deliberate Indifference

#### a.     Defendant Obi

Plaintiff 's allegations against Defendant Obi concern her failure to timely and adequately treat his cough and pain issues. Dr. Obi refers the following medical notations in Plaintiff's records in support of her Motion:

- On June 27, 2011, Plaintiff first complained about a cough and submitted a sick call request, the only request submitted on this issue. (Doc. No. 131-1, p. 2.)[3] A non-party nurse saw Plaintiff in the Infirmary on June 27, 2011, noting a dry cough, greenish-yellow drainage, and an earache. (Id., p. 3.)

---

[3]Although Plaintiff dated this sick call request on June 24, 2011, it was not marked received in the infirmary until June 27, 2011.

- Plaintiff returned to the Infirmary on June 28, 2011, complaining about a non-productive "non stop" cough, and the nurse referred him to the physician. (Id, p. 6.)  He returned later that same day with the same complaint and a non-party nurse prescribed an antibiotic and a cough medicine. (Id., p 7.)

- On July 1, 2011, an officer took Plaintiff to the Health Services office based on the persistent cough.  (Id., p. 8.)  Defendant Clowers examined Plaintiff and, pursuant to a doctor's verbal orders, prescribed Albuterol, a blood pressure medication, and Tramadol for pain. (Id.)  She also ordered lab work and x-rays.  (Id.)

- An officer asked Nurse York (non-party) to examine Plaintiff on July 4, 2011, due to his cough and breathing problems.  (Id., p. 11.)  The nurse noted some bruising on the lower rib cage, possibly from coughing, and provided him with an Albuterol updraft and a Mucinex tablet.  (Id.)  A chest x-ray was scheduled for the following day.  (Id.)  According to the x-ray results, Plaintiff reported a history of cough for nineteen days, "but has improved," and the findings were normal. (Id., p. 12.)  Defendant Obi reviewed these results on July 11, 2011.  (Id.)

- Defendant Summerville met with Plaintiff during a chronic care clinic on July 19, 2011, at which time Plaintiff denied shortness of breath, dizziness, headache or chest pain. (Id., p. 13.)  On July 20, 2011, Defendant Obi reviewed Plaintiff's lab results.  (Id., pp. 15-16.)

- During the evening of July 19, 2011, Plaintiff reported to the Infirmary with complaints of rib pain due to cough.  (Id., p. 17.)  Defendant Awopetu examined him and noted no wheezing or crackle to the breath sounds and that Plaintiff received his scheduled dose of Tramadol.  (Id.)  She also noted that lab and x-ray tests were conducted and that Plaintiff was scheduled to receive the results the next day.  (Id.)

- On July 20, 2011, Plaintiff reported to the Infirmary with continued complaints of cough and rib pain. (Id., p. 18.)  The nurse noted a dry nonproductive cough and referred him to a mid-level provider.  (Id.) Later that same day, Defendant Clowers examined him, noted the medications which were provided to him in the past, but were not effective, and ordered a chest x-ray to rule out broken ribs.  (Id., p. 19.)  She also placed Plaintiff on the doctor's sick call list.  (Id.)  The chest x-ray results showed no abnormalities.  (Id., p. 20.)

- Plaintiff returned to the Infirmary with complaints of nausea from vomiting on July 22, 2011.  (Id., p. 21.)  The nurse referred him to a physician and ordered an activity restriction for twenty-four hours.  (Id.)

- Defendant Summerville again saw Plaintiff on July 26, 2011, with continued complaints of pain. (Id., p. 24.)  She re-ordered the chest x-ray and noted that he would see the doctor the next day. (Id.)  The results of the x-ray showed "hyperexpansion which may be seen in obstructive lung disease with his asthma or COPD, but no acute cardiopulmonary abnormality."  (Id., p.. 27.)  The x-ray of Plaintiff's right rib area showed no abnormalities.  (Id, p. 28.)

- Dr. Obi examined Plaintiff on July 29, 2011, and ordered an ultrasound to rule out gallbladder disease, a right rib series x-ray, cough medicine, and three days' worth of pain medication and phenergan (for nausea).  (Id., p. 29.)  She also completed a consultation request for the ultrasound.  (Id., p. 30.)

- On August 7, 2011, Plaintiff submitted a sick call request form for an unrelated issue (rash). (Id., p. 37.)

- On August 8, 2011, Plaintiff underwent an ultrasound test.  (Id., p. 38.) Defendant Clowers reviewed the test results and saw Plaintiff on August 18, 2011.  (Id., p. 41.)  She noted that the

ultrasound did not visualize the gallbladder or the pancreas, because Plaintiff had eaten prior to the test.  (Id.)  She rescheduled the gallbladder ultrasound.  (Id.)  Plaintiff underwent the second ultrasound test on August 22, 2011.  (Id., p. 42.)  Results showed no evidence of stones or polyps in the gallbladder and a mild thickening of the gallbladder wall.  (Id.)

- Dr. Obi examined Plaintiff on August 31, 2011 for cough and pain, and Plaintiff appeared in no apparent distress with signs of good breathing. (Id., p. 43.)  Dr. Obi prescribed antibiotics and cough medicine, referred him for a chest ct scan, and referred him to a general surgeon for evaluation of chronic cholecystitis,[4] noting she was not sure if he had gallbladder stones.  (Id., p. 43.)

Based on this chronology, Dr. Obi states Plaintiff cannot provide any evidence that she acted with deliberate indifference to his serious medical needs.  The records show that she personally examined him on at least two occasions, and reviewed his medical records and tests on several others.  The records also reflect that Plaintiff was not denied medical care or treatment during this time, as he was seen in the Infirmary often and sometimes more than once a day.  Dr. Obi states in her Declaration that during July and August, 2011, she worked full-time primarily in the Diagnostic Unit hospital, as opposed to the Infirmary, and if a nurse practitioner encountered a patient with an urgent condition, he/she would escort the patient to see the doctor in the hospital.  (Doc. No. 131-3, p. 1.)  She states that despite the numerous tests which were conducted, the cause of Plaintiff's cough remains unknown, but that the abdominal pain was musculoskeletal and related to the cough. (Id., p. 7.)  She concludes that the nurses properly exercised their medical judgments when treating

---

[4]Defined as "inflammation of the gallbladder."
Http://www.mayoclinic.com/health/cholecystitis/DS01153.

Plaintiff and they all treated his condition the best they could with their knowledge and medical judgment.  (Id.)

Defendant Obi also presents the Affidavit of Dr. Robert Floss, the Regional Medical Director for Corizon, Inc., which is the medical care provider for ADC inmates.  (Doc. No. 131-8.)  After reviewing Plaintiff's medical records, he states that Defendant Obi and the other Defendants did not ignore Plaintiff's cough, and that dry coughs are less serious than productive ones.  (Id., p. 2.)  Based on the medications Plaintiff took during the relevant time period, "there was no need for any additional medication or treatment."  (Id.)

In his Response (Doc. No. 133), Plaintiff states that although the mid-level providers continued to refer him to see Dr. Obi, he did not initially see her for twenty-nine days after he first complained of the cough and pain.  Plaintiff claims Obi's failure to prescribe more than three days' worth of pain medication to him – despite his obvious pain – is proof of deliberate indifference.  He further states that he is very well-known at the Diagnostic Unit, and despite Defendants' argument that he should have submitted more sick call requests, he did not need to submit requests to be seen because they all should have been aware of his serious medical needs.  Plaintiff claims that he was escorted to the Unit hospital on July 20, 2011, by Officer K. Jenkins, and that when Dr. Obi arrived at the hospital she ordered him out and stated that his was an Infirmary, not a hospital, issue.  He provides an affidavit of Jenkins who states that he took Plaintiff to the hospital at 5:45 a.m., during shift change, and after Dr. Obi entered the hospital and heard the nurses talking about Plaintiff and his symptoms, she told him he did not have a hospital issue, but an infirmary issue, and needed to submit a sick call.  (Doc. No. 126, pp.128-129.)

In order to support a claim for an Eighth Amendment violation, Plaintiff must prove that

Defendant acted with deliberate indifference to a serious medical need. Farmer v. Brennan, 511 U.S. 825, 834 (1994). However, even negligence in diagnosing or treating a medical condition does not constitute a claim of deliberate indifference. Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Rather, the "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation," Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995). See also Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990) (holding that a mere disagreement with a course of medical treatment is insufficient to state a claim for relief under the Eighth Amendment). Furthermore, prison physicians are entitled to exercise their medical judgment, and "do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996).

An inmate who complains that a delay in medical treatment constitutes a constitutional violation must provide "verifying medical evidence" in the record to establish the detrimental effect of the delay, in order to succeed on his claim. Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995) (overruled in part on other grounds), quoting Hill v. Dekalb Regional Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994). Finally, "[i]n the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment." Dulany, supra, 132 F.3d at 1240.

The Court finds no evidence to support a constitutional deliberate indifference claim against Dr. Obi. Even assuming Plaintiff's allegation true – that on July 20, 2011, Dr. Obi told him to leave the hospital and report his complaint to the Infirmary – that single incident does not support a

finding of deliberate indifference, because Plaintiff was treated in the Infirmary on that same day. (Doc. No. 131-1, pp. 17-19.)  Plaintiff received medical care and treatment from Dr. Obi, who reviewed his medical records and tests on several occasions and examined and treated him on at least two occasions.  In addition, Plaintiff cannot show that any delay in receiving care caused a detrimental effect to his health.  Defendants arranged for numerous x-rays, ct scans and ultrasounds, together with medications, and ruled out several causes of his cough.  In addition, the condition eventually resolved itself on its own.  Finally, "[i]n the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment."  Dulany, supra, 132 F.3d at 1240.  Therefore, absent any further evidence that Dr. Obi acted with deliberate indifference, the Court finds as a matter of law that Plaintiff's claim against her should be dismissed.

      b. Defendant Clyde

   Plaintiff's claim against Defendant Clyde is based on her failure to adequately treat his cardiac issues, and on her delay in ordering tests.  In support of her Motion, she refers to the following relevant entries in Plaintiff's medical records:

  - On October 18, 2011, Dr. Clyde saw Plaintiff to review his records and his emphysema condition. (Doc. No. 131-4, p. 1.)  She explained her conclusion not to prescribe medication for the condition due to his cardiac condition and cough history, and noted that the steroids he took for a rash could also be helpful in treating severe COPD.  (Id.)

  - On October 25, 2011, Clyde reviewed a surgery clinic consultation report from Dr. Buchman (who concluded that Plaintiff did not have a gallbladder problem), and prepared a

consultation request for a ct scan of the abdomen and pelvis, per Buchman's recommendation. (Id., Doc. No. 131-1, p. 64.)

- Dr. Clyde first treated Plaintiff for the cardiac issue on November 3, 2011, when he reported swelling of his ankle and increased angina. (Doc. No. 131-1, p. 66.)  Plaintiff said he suffered from symptoms similar to those he had previously suffered prior to the placement of stints , but did not report chest pain or shortness of breath. (Id.)  Dr. Clyde scheduled a visit the following day with a cardiologist, Dr. Dharamsey, but Plaintiff declined her offer to sleep in a hospital bed until then.  (Id., pp. 67-69.)

- Plaintiff saw Dr. Dharamsey on November 4, 2011, and he recommended various tests and a return visit in a month.  (Id., pp. 70-72.)  He did not state that the studies or the visit was urgent. (Doc. No. 131-4, p. 2.)  Dr. Clyde reviewed the consultation report and prepared requests for the various studies suggested on December 9, 2011. (Doc. No. 131-1, pp. 74-80.) The requests were approved on December 12, 2011, and she was not involved in scheduling the appointments.  (Id., pp. 80-83; Doc. No. 131-4, p. 2.)

- On December 28, 2011, Dr. Dharamsey performed the recommended tests.  (Doc. No. 131-1, pp. 84-87.)  The stress test was positive and the Venous evaluation stated, "this procedure is indicated after failure of 3-5 months trial of conservative medical therapy including but not limited to leg elevation, compression stockings and recommended weight loss." (Id., p. 85.)  Based on this conclusion, Dr. Clyde did not find a medical significance to any delay of tests. (Doc. No. 131-4, p. 2.)

- On January 19, 2012, Defendant Simmons reviewed the test results, faxed to the Unit that same day, and prepared a consultation request for a follow-up appointment with Dr. Dharamsey.

22

(Doc. No. 131-1, pp. 88-91.)  The appointment took place on February 17, 2012, at which time Plaintiff was diagnosed with "angina status post stent as well as an abnormal MPI (Myocardial Perfusion Imaging)."  (Id., pp. 92-96; Doc. No. 131-4, p. 3.)  A cardiac catheter and dye test and possibly an angioplasty were recommended. (Doc. No. 131-1, p. 96.)

- Dr. Clyde examined Plaintiff on March 2, 2012 and submitted a consultation request for those procedures. (Id., p. 97.)  Plaintiff underwent the cardiac cath on March 29, 2012, and was discharged back to the Unit on March 30, 2012.  (Id., p. 98.)  Dr. Clyde examined him upon his return and entered orders for various medications.  (Id., p. 30.)

Based on these events, Dr. Clyde states Plaintiff provides no evidence that she acted with deliberate indifference to his serious medical needs.  In her Declaration, she states she does not know when she first received the recommendations for tests following Plaintiff's November 4, 2011 appointment with Dr. Dharamsey, or why they may have been delayed.  (Doc. No. 131-4, p. 3.)  Once she did review the recommendations, however, she prepared consultation requests and was not negligent or indifferent to his care.  (Id.)  She notes that Plaintiff did not report heart complaints to the Infirmary from the time of his November 4, 2011, appointment until after he saw Dr. Dharamsey on December 28, 2011, and did not file any sick calls during that time period.  (Id., p. 4.)

Defendant Clyde also presents the Affidavit of Dr. Robert Floss.  (Doc. No. 131-8.)  He states that after reviewing Plaintiff's medical records, he finds no evidence that Plaintiff's cardiac condition was ignored by Defendants.  (Id., p. 2.)  In addition, "any delay in Mr. Bryant receiving the testing and studies and follow up appointments were not unreasonable and they did not detrimentally affect his health....There was nothing in Dr. Dharamsey's recommendations to indicate that there was any urgency to the testing...[and] no medical record of Mr. Bryant having any

complaints or complications regarding his heart or of him even reporting to the infirmary from November 3, 2011 through January 6, 2012...or from January 19, 2012, through March 30th,..." (Id., p. 3.)

Plaintiff responds by stating that Defendant's deliberate indifference is evidenced by the fact that the grievance he filed about the delay of ordering tests (OR-11-00228), was found to be with merit. (Doc. No. 5, p. 34.)  He states 147 days elapsed between his first complaint on November 3, 2011, and the placement of the stint on March 29, 2012, and that he could provide evidence of deliberate indifference with the assistance of an attorney.

He also questions the medical opinions of Dr. Clyde and Dr. Floss, based on the fact that they are not cardiologists.  Although he admits that a cardiologist told him later that the delay did not contribute to the number of heart procedures he underwent, he states he still suffered a detrimental effect in the form of pain and suffering during that time.  Plaintiff also states that the "treatment plan" for blockage pain involves taking a nitroglycerine tablet and repeating the process fifteen minutes later.  If that doesn't work, "get to a hospital."  (Doc. No. 133, p. 21.) He claims he does not have the choice, like non-incarcerated persons, to seek treatment from other physicians. In response to Defendants' argument that he did not submit a sick call request after his November 4, 2011, appointment, he states, "I used a lot of Nitro" during that time.  (Doc. No. 133, p. 22.)

Again, the Court finds no evidence of deliberate indifference by Defendant Clyde.  Even assuming her fault in the delay in scheduling the medical tests, Plaintiff provides no proof that she acted intentionally to cause him harm, or that the delay caused him harm.  Although Plaintiff states he was harmed because he suffered from pain during that time, the Court cannot ignore the undisputed fact that he sought no treatment for such pain from November 3, 2011, until he

underwent the tests at the cardiologist's office on December 28, 2011.  Nor does he provide any evidence of deliberate indifference on Dr. Clyde's part from that time until the placement of his first stent, on March 29, 2012.  And again, "[i]n the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment." Dulany, supra, 132 F.3d at 1240.   Therefore, the Court finds as a matter of law that Plaintiff's claims against Defendant Clyde should be dismissed.

c.      Defendant Simmons

Defendant Aric Simmons changed some of Plaintiff's medications on January 6, 2012. According to his Declaration, Plaintiff's prescription for Tramadol expired on January 5, 2012, and his prescription for Prilosec was scheduled to expire on January 7, 2012.  (Doc. No. 131-9, pp. 1, 4.)   Effective January 1, 2012, Tramadol, Prilosec, and Baclofen were removed from the nonformulary list.  (Id., pp. 1, 5-6.)  Simmons decided to prescribe Meloxicam for his chronic pain, together with Nortriptylyne as an adjunctive therapy, noting that he did not have the ability to renew Tramadol, because he was not licensed to prescribe it, or other narcotic medications.  (Id., p. 2.) However, although Baclofen also was removed from the nonformulary list, Simmons continued Plaintiff's prescription for it because there was no alternative drug available on the nonformulary list.  (Id.)  Simmons also told Plaintiff to submit a sick call request if the pain medications he prescribed were not effective.  (Id.)

In addition to these medications, Simmons ordered Ranitidine to treat gastroesophageal reflux instead of the Prilosec, both because Prilosec did not appear on the nonformulary list and because long-term use of the drug is known to cause side effects.  (Id.)  Again, Simmons instructed

25

Plaintiff to submit a sick call request if the medication was not effective. (Id.) On that day, Simmons issued prescriptions to Plaintiff for twelve medications.  (Id., pp. 7-8.)

Plaintiff questions the veracity of Simmons' statement, denying that Simmons told him on January 6, 2012, that he could not prescribe a narcotic, and he questions the absence of documentation of their encounter.

As noted earlier, prison physicians are entitled to exercise their medical judgment, and "do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." Long v. Nix, 86 F.3d at765.  Although Defendant Simmons is not a physician, he is a licensed medical care provider, and the decisions concerning Plaintiff's changes in medication do not support a constitutional violation.  Plaintiff does not deny that Simmons told him to submit a sick call if the medications did not work.  And, Plaintiff provides no evidence that he took such action and that Defendants acted with deliberate indifference in response.  Therefore, absent any other submission by Plaintiff, the Court finds as a matter of law that Simmons did not violate Plaintiff's Eighth Amendment rights.

**III.    Conclusion**

IT IS, THEREFORE, RECOMMENDED that:

1.     Plaintiff's Motion for Summary Judgment (Doc. No. 126) be DENIED.

2.     Defendants' Motion for Summary Judgment (Doc. No. 129) be GRANTED.

3.     Plaintiff's claims against Defendants Corizon, Inc., Juanita Stell, Roslyn Summerville, Wannetta Clowers, and Sabainah Awopetu be DISMISSED without prejudice.

4.     Plaintiff's claims against Dr. Nwannem Obi-Okoye, Dr. Debra Clyde, and Aric Simmons be DISMISSED with prejudice.

26

IT IS SO RECOMMENDED this 27th day of November, 2013.

_____

JEROME T. KEARNEY
UNITED STATES MAGISTRATE JUDGE